**SECOND DIVISION**
**MILLER, P. J.,**
**MERCIER and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**May 3, 2023**

# In the Court of Appeals of Georgia

A23A0522. BRASELTON ASC, LLC et al. v. GEORGIA DEPARTMENT OF COMMUNITY HEALTH et al.

MERCIER, Judge.

In this matter, Braselton ASC, LLC, a wholly owned subsidiary of Northeast Georgia Medical Center, Inc., ("NGMC-BASC") and certain affiliated entities, appeal from a superior court order affirming the decision by the Georgia Department of Community Health (the "Department") to award Braselton Surgical Specialist Center, LLC, a wholly owned subsidiary of Northside Hospital, Inc., ("Northside-BSSC") a certificate of need ("CON") for the establishment of a new ambulatory surgery center in Braselton, Georgia. Among other things, NGMC-BASC contends that the Commissioner of the Department exceeded her authority by making a novel finding

of fact regarding the "net revenues" of Northside-BSSC. For the reasons that follow, we disagree and affirm.

As background information, the CON program "establishes a comprehensive system of planning for the orderly development of adequate health care services throughout the state." *Doctors Hosp. of Augusta v. Dept. of Community Health*, 356 Ga. App. 428, 429 (847 SE2d 614) (2020) (citation and punctuation omitted). To foster this goal, OCGA § 31-6-40 (a) mandates that "any new institutional health service shall be required to obtain a certificate of need," and an ambulatory surgery service center is a "new institutional health service" requiring a CON. See OCGA § 31-6-40 (a) (5); OCGA § 31-6-40 (b); OCGA § 31-6-2 (8).

To obtain a CON, an application must be submitted to the Department, thereby triggering an initial review to determine whether the proposed project "is consistent with the applicable considerations" of the CON program. See OCGA § 31-6-43 (g); OCGA § 31-6-21 (b) (4) (authorizing the Department "[t]o adopt, promulgate, and implement rules and regulations sufficient to administer" the CON program); OCGA § 31-6-42 (setting forth considerations for the grant or denial of a CON); Ga. Comp. R. & Regs. r. 111-2-2-.40 (sevice-specific review considerations applicable to ambulatory surgery centers). After the initial review is completed, the Department

2

"provide[s] written notification to an applicant of the [D]epartment's decision to issue or to deny issuance of a certificate of need for the proposed project." OCGA § 31-6-43 (i).

Upon proper request made by a party, the Department's initial decision may be reviewed in an administrative appeal before a hearing officer. See OCGA § 31-6-44. The hearing officer conducts a full evidentiary hearing in order to make a de novo review of the propriety of the Department's initial ruling. Once this review is completed, the hearing officer must issue an order containing written findings of fact and conclusions of law that explain the hearing officer's decision to either approve or disapprove of the initial decision. See OCGA § 31-6-44 (e), (f), (i).

Afterwards, an aggrieved party may appeal the hearing officer's decision to the Commissioner of the Department. See OCGA § 31-6-44 (i).

> In the event an appeal of the hearing officer's decision is filed, the [C]ommissioner may adopt the hearing officer's order as the final order of the [D]epartment or the [C]ommissioner may reject or modify the conclusions of law over which the [D]epartment has substantive jurisdiction and the interpretation of administrative rules over which it has substantive jurisdiction. By rejecting or modifying such conclusion of law or interpretation of administrative rule, the [D]epartment must state with particularity its reasons for rejecting or modifying such conclusion of law or interpretation of administrative rule and must make a finding that its substituted conclusion of law or interpretation of administrative rule is as or more reasonable than that which was rejected

3

or modified. Rejection or modification of conclusions of law may not form the basis for rejection or modification of findings of fact. The [C]ommissioner may not reject or modify the findings of fact unless the [C]ommissioner first determines from a review of the entire record, and states with particularity in the order, that the findings of fact were not based upon any competent substantial evidence or that the proceedings on which the findings were based did not comply with the essential requirements of law.

OCGA § 31-6-44 (k) (1). If an appeal is made to the Commissioner, the Commissioner's order is the Department's final agency decision. See OCGA § 31-6-44 (m).

If dissatisfied, a party may then seek judicial review of the Commissioner's ruling by filing an appeal in superior court. See OCGA § 31-6-44.1 (a). The superior court, however, may not reverse or modify the Department's final decision unless it finds that:

substantial rights of the appellant have been prejudiced because the procedures followed by the [D]epartment, the hearing officer, or the [C]ommissioner or the administrative findings, inferences, and conclusions contained in the final decision are:
(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the [D]epartment;
(3) Made upon unlawful procedures;
(4) Affected by other error of law;
(5) Not supported by substantial evidence, which shall mean that the record does not contain such relevant evidence as a reasonable mind might accept as adequate to support such findings, inferences, conclusions, or decisions, which such evidentiary standard shall be in

4

excess of the "any evidence" standard contained in other statutory provisions; or

(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Id. And, if the superior court's decision is appealed to this Court, "[w]e apply the same standards of judicial review when considering the superior court's decision[.]" *ASMC, LLC v. Northside Hosp.*, 344 Ga. App. 576, 581 (810 SE2d 663) (2018).

With these precepts in mind, the record reveals that, in response to a batching notice from the Department, NGMC-BASC and Northside-BSSC filed separate applications for a CON in November 2018, and both entities wished to open a freestanding ambulatory surgery center less than a mile from each other. The Department joined the applications for review due to the projects' proximity and their proposed service to overlapping areas. In its initial desk decision, the Department's Office of Health Planning found that both projects independently satisfied all applicable review considerations and criteria, including special considerations applicable to ambulatory surgery centers. See OCGA § 31-6-44.1 (a); Ga. Comp. R. & Regs. r. 111-2-2-.09; and Ga. Comp. R. & Regs. r. 111-2-2-.24. And, as is most relevant to the current controversy, the Department determined that both projects,

5

when considered independently, were financially feasible.[1] With regard to Northside-

BSSC, the Department found:

> The total estimated cost of BSSC's proposed project is $23,895,037, to be financed by unrestricted cash reserves from [Northside-BSSC's] parent company [Northside Hospital, Inc. ("NHI")]. A letter from Anne Eiswirth, Director of Finance and System Controller for NHI, and audited financial statements verify the availability of funds to finance the proposed project. The estimated completion date for the proposed project is November 14, 2020. The applicant anticipates 58 full-time equivalent staff will be required to implement the proposed project. The applicant projects a positive net income for the facility by Year 2. . . . Based on the assumptions provided, the Department finds each proposed project financially feasible.

In addition, the Department explicitly found that Northside-BSSC's projected charge

per procedure of "$11,967 in Year 1 and $12,547 in Year 2" was "not unreasonable."

Given the close proximity of the two proposed projects, however, the Department

expressed "doubt" that both projects would be financially feasible if jointly approved,

although they were determined to be separately financially feasible. Due to this doubt,

the Department applied the tiebreaker considerations of Rule 111-2-2-.09 (7) (a) (1-

---

[1] With regard to the applicable review considerations and criteria, NGMC-BASC challenges only Northside-BSSC's financial feasibility.

6

10), and it determined that NGMC-BASC should be granted a CON while Northside-BSSC should not.[2]

Northside-BSSC appealed the Department's initial decision to a hearing officer presiding over a CON review panel, and NGMC-BASC intervened. NGMC-BASC opposed the grant of a CON to Northside-BSSC, arguing that: (1) Northside-BSSC's CON application was incomplete as initially filed and did not satisfy the requirements of Rule 111-2-2-.06 (5) because it contained only a partial set of audited financial statements of Northside Hospital System; and (2) the Northside-BSSC project was not financially feasible under OCGA § 31-6-42 (a) (4) and Rule 111-2-2-.09 (1) (d). The hearing officer issued a ruling affirming the initial decision to award a CON to NGMC-BASC, but he reversed the initial decision to deny a CON to Northside-BSSC.

With regard to the reversal, the hearing officer concluded that Northside-BSSC's CON application was complete. The documents submitted by Northside-BSSC were excerpts of the combined financial statements of Northside Hospital System for financial years ending September 30, 2017, and September 30, 2016. These documents included combined balance sheets, combined statements of

---

[2] The grant of a CON to NGMC-BASC is not at issue in this appeal.

operation, and combined statements of changes in net assets. Considering these documents, the hearing officer found:

> While the NGMC Parties contend that BSSC was required to submit Northside's complete audited financial statements report with its initial application, newly formed entities that have not undergone financial audits, like BSSC, are not required to provide audited financial statements. Rule 111-2-2-.06 (5) (b) 1 (v). The Department's analyst testified that the financial statements of the Northside system that were submitted were sufficient for completeness and review of the application.

The hearing officer also found that the Northside-BSSC project was financially feasible based on a number of documents and testimony.[3] With its CON application, Northside-BSSC submitted a pro forma indicating that the projected net income of its project would be $679,000 by the second year of operation. This projection is based on a certain number of doctors at Northside-BSSC treating a certain number of patients and charging higher than average prices per procedure based on their complexity. The hearing officer concluded that Northside-BSSC had the ability to achieve the patient volumes projected in its pro forma by redirecting patients within Northside's current network. He also found that Northside-BSSC would be charging

---

[3] The hearing officer explicitly found that "[t]he Initial Decision correctly concludes that BSSC's project is financially feasible within the meaning of Rule 1l1-2-2-.09 (1) (d)."

8

these patients higher fees associated with complex surgical procedures, noting that Northside-BSSC's facilities would be "designed to offer high complexity procedures through the inclusion of four 23-hour extended recovery rooms." The hearing officer stated: "BSSC's charges, while higher than those proposed by BASC, are not unreasonable and appear to be consistent with BSSC's evidence that its proposed surgery center will treat high complexity patients who have higher charges on average." The hearing officer also stated:

> At the time of [the initial] application, BSSC presented a utilization projection for its ambulatory surgery service based on an assumption that 60% to 65% of existing ambulatory surgery patients residing in the BSSC service area who obtained care at Northside's existing ambulatory surgery services (excluding certain cases who would not be expected to be redirected, such as Kaiser patients and specialty breast surgery patients) would be redirected to the BSSC project. Thus, the utilization projection for year 2 of the BSSC project assume[s] that 2,189 patients will be comprised of patients redirected from the Northside system. The Department and its review analyst found these redirection assumptions to be reasonable. (Citations omitted.)

And, the hearing officer went on to find that, as a result of growth in the Northside Hospital system and an increase in service-area residents subject to redirection since the initial desk decision of the Department, "only approximately 27% of the Northside patients from the service area available for redirection would have to be redirected to the Northside-BSSC project for it to meet its projections." The hearing

9

officer also found that Northside-BSSC would have an adequate number of physicians to perform the complex procedures that were anticipated.

With regard to the types of these procedures to be performed, the hearing officer pointed out that,

> as the Department's review analyst conceded at the hearing, it is logical that more complex procedures yield higher charges. With the availability of an extended recovery unit, BSSC expects that it will perform more complex procedures than are typically performed in a freestanding [ambulatory surgery center] environment. An extended recovery unit allows physicians to perform more complex cases in BSSC's proposed project. With higher complexity, BSSC anticipates and projects higher charges than the average freestanding surgery center. (Citations omitted.)

These findings were partially based on testimony from Northside-BSSC's health planning expert, Marty Chafin, that the project would generate a higher revenue than normal based on the complexity of procedures. The hearing officer also observed:

> The volume of 77 Northside-affiliated surgeons and gastroenterologists in the service area is more than sufficient for BSSC to obtain its projected volume of patients; other Northside ambulatory surgery services, such as Northside Alpharetta Surgery Center, are able to generate sufficient volumes of cases to generate a positive income with as few as 22 surgeons practicing annually.

Based on these collective findings, in addition to findings that both projects would be financially feasible despite their proximity to each other, the hearing officer determined that Northside-BSSC was entitled to a CON.[4]

Unhappy with the hearing officer's conclusion, NGMC-BASC appealed that decision to the Commissioner pursuant to OCGA § 31-6-44 (i), raising the same arguments again. The Commissioner adopted all of the hearing officer's findings of fact and conclusions of law and agreed that Northside-BSSC's CON application should be granted.

The Commissioner affirmed the hearing officer's determination that Northside-BSSC had filed a complete application containing adequate financial statements. Then, in addressing NGMC-BASC's arguments regarding financial feasibility, the Commissioner concluded:

> The claims are rejected that the Northside Parties cannot meet the projections concerning earnings, and does not have an adequate number of committed physicians, surgeons and ancillary providers to refer patients or to provide free services. The Hearing Officer found that *the information presented by the Northside Parties* was sufficient to show

---

[4] The hearing officer concluded that the Department had inappropriately applied a tiebreaker analysis, stating: "During the Department's initial review of the projects, no evidence was requested, presented, or analyzed by the Department as to whether the projects both could be financially feasible if both were simultaneously approved."

11

the financial and operational feasibility of BSSC to draw sufficient patients; to have a comprehensive panel of physicians, surgeons and ancillary providers; and to have an adequate system of providing free services for the uninsured and under-insured sufficient to meet the requirements to issue BSSC a CON. Also, the NGMC Parties' claims that the Northside Parties do not have enough practitioners in the proposed service area and related allegations are not persuasive. To the contrary, the Northside Parties have demonstrated BSSC has the required providers and can provide sufficient free services to patients in order to meet its charity care obligation.

This Order acknowledges there is adequate volume of patients and providers to support both the BASC and the BSSC projects without having an adverse effect on the other's project.

(Emphasis supplied.) As noted above, "the information presented by the Northside Parties" included testimony regarding revenue from Chafin. Finally, the Commissioner decided to "adopt the Hearing Officer's order as the final order of the Department."

NGMC-BASC next petitioned for judicial review in the superior court, and revisited the same arguments it raised before both the hearing officer and the Commissioner. After briefing and a hearing, the superior court issued an order affirming the Commissioner's decision. Thereafter, NGMC-BASC filed an application for discretionary appeal, which we granted. This appeal followed.

12

1. NGMC-BASC contends that the financial documents submitted by Northside-BSSC were insufficient to satisfy the completeness requirements of Rule 111-2-2-.06 (5). We disagree.

In relevant part, Rule 111-2-2-.06 (5) provides:

(b) An application will be determined to be incomplete if any of the following were not either provided with the application or as may be specified in this Section, submitted previously to the Department:
1. all the required data, information and assurances provided on the correct forms, including but not limited to the following: . . .
(v) most recent audited financial statements, or personal financial statements if audited statements are not available (tax returns would meet this requirement for unaudited entities and individuals)[.]

To comply with this rule's requirements, Northside-BSSC submitted with its CON application relevant portions of Northside Hospital System's 2016 and 2017 audited financial statements containing balance sheets and certain other statements. NGMC-BASC argues that this submission did not satisfy the Department's completeness requirement because Northside-BSSC failed to include a cash flow statement or auditors' notes with the System's financial statements – in other words, the *entire set* of "most recent audited financial statements." NGMC-BASC also contends that Northside-BSSC failed to establish the relationship between itself and Northside Hospital System, thereby showing the relevancy of the submitted documents.

13

The superior court rejected both contentions. With regard to the use of a partial set of audited statements of a parent company to show the finances of an unaudited subsidiary, the superior court noted that "nothing in the rule language requires an applicant to provide the entire [audited] financial report, including the auditor's note and the cash flow statements" and "the rule clearly allows an unaudited entity to provide other documents such as tax returns." Giving consideration to evidence from the Department,[5] the superior court found that the Department "has correctly interpreted this rule and listed what an unaudited entity like BSSC can provide in the Department's CON application form." We agree that Northside-BSSC's application was properly deemed to be complete.

As noted, Northside-BSSC is a new entity that does not have any audited statements of its own, much less a full set of audited statements to provide. For this reason, the Department's rule provides that Northside-BSSC's application may be completed with "personal financial statements" such as tax returns. And, in the application for a CON, to which the completeness rule applies, the applicant is required to answer: "Does the Applicant undergo annual financial audits?" If the

---

[5] The Department's health planning analyst testified that the financial statements were sufficient for review of the application.

14

answer is "no," the application form instructs the applicant: "Please provide Balance Sheets, Bank Statements, Tax Returns, or other financial statements verifying income." Thus, based on the plain language of the rule (and the application form for a CON), "personal financial statements" include the type of financial documents submitted by Northside-BSSC.[6] Furthermore, as the trial court found, nothing in Rule 111-2-2-.06 (5) imposes the additional requirements argued by NGMC-BASC, and we will not rewrite the rule to add them.

In a corollary argument, NGMC-BASC contends that Northside-BSSC failed to prove the relevance of the submitted financial documents because there was no evidence that its parent company, Northside Hospital, Inc., had any relation to "Northside Hospital System." As the superior court pointed out, however, there was: (1) documentation of a review analyst stating that "Northside Hospital is part of that health system;" and (2) information in the record of a prior matter where Northside provided Northside Hospital System's financial documents, and "'the Department's analyst testified that combined or system-wide financial statements have routinely

---

[6] "Because the rule is not ambiguous, we do not reach the question of whether deference is appropriate in the case of true ambiguity." *City of Guyton v. Barrow*, 305 Ga. 799, 804 (2) (828 SE2d 366) (2019).

15

been accepted.'" So, contrary to NGMC-BASC's arguments, there was evidence and testimony to connect "Northside Hospital System" with Northside-BSSC.

2. NGMC-BASC next contends that the Commissioner exceeded her statutory review authority by concluding that the Northside-BSSC project is capable of making adequate revenue to be financially feasible. See OCGA § 31-6-44 (k) (1); OCGA § 31-6-44.1 (a) (1) - (5). More specifically, NGMC-BASC argues that the hearing officer failed to make an explicit finding that the project would achieve certain "net revenues," and the Commissioner exceeded her authority by making this finding of fact on her own. Because the Commissioner neither rejected nor modified any finding of fact made by the hearing officer, however, we disagree.

Before a CON is granted, an applicant must show that "[t]he project can be adequately financed and is, in the immediate and long term, financially feasible." OCGA § 31-6-42 (a) (4); see also Ga. Comp. R. & Regs., r. 111-2-2-.09 (1) (d). The Department generally requires an applicant to show that its project would have a positive net income by the second year of operation. . With its CON application, Northside-BSSC submitted a pro forma indicating that its projected net income would be $679,000 by the second year of operation. This income projection is calculated by considering a certain number of cases and adding the revenue generated by those

16

cases. With regard to Northside-BSSC's projection, Chafin, a health planning expert, testified before the hearing officer that the projections in Northside-BSSC's pro forma appeared to be reasonable, basing her conclusions on other exhibits that were entered into the record and her knowledge of the ability of more complex cases to generate higher net revenue.

As set forth above, the hearing officer determined that Northside-BSSC's project was financially feasible based on the ability to divert an adequate number of patients from its existing system, by recruiting an adequate number of doctors from its existing system, and by conducting more complex, and necessarily, more expensive procedures made possible by the construction of advanced longer-term recovery rooms. In the simplest terms, the hearing officer found that the volume of patients and the complexity of procedures warranted the grant of a CON. The hearing officer also compared Northside-BSSC's facility to other facilities already in existence, noting that:

> The volume of 77 Northside-affiliated surgeons and gastroenterologists in the service area is more than sufficient for BSSC to obtain its projected volume of patients; other Northside ambulatory surgery services, such as Northside Alpharetta Surgery Center, are able to generate sufficient volumes of cases to generate a positive income with as few as 22 surgeons practicing annually.

In other words, Northside-BSSC had more than an ample number of doctors to handle a sufficient volume of cases *to generate positive income*. This determination, ultimately, is a matter of addition; the hearing officer made findings of fact regarding the variables that must be considered together in a straightforward mathematical calculation that predicts financial feasibility over the first two years of operation.

In its appeal before the Commissioner, NGMC-BASC argued that, because the hearing officer did not expressly use the term "net revenue" in his ruling, that ruling had to be reversed. In other words, NGMC-BASC maintained that, in the absence of this discussion, there could be no finding of financial feasibility. In response, the Commissioner "rejected [the claim] that the Northside Parties cannot meet the projections concerning earnings, and does not have an adequate number of committed physicians, surgeons and ancillary providers to refer patients or to provide free services." In making this finding, the Commissioner explicitly relied on the hearing officer's findings of fact that Northside-BSSC would draw a sufficient number of patients and physicians to be both financially and operationally feasible.[7]

---

[7] A hearing officer is required to make written findings of fact and conclusions of law as to each review consideration as provided under OCGA § 31-6-42 (a), including a detailed statement of reasons for the decision. OCGA § 31-6-44 (i).

18

NGMC-BASC contends that the Commissioner nonetheless exceeded her authority by making a novel finding of fact, arguing that, by "rejecting" NGMC-BASC's claim that Northside-BSSC cannot meet its net revenue projections, the Commissioner necessarily determined that Northside-BSSC *can* meet its net revenue projections—a factual issue that the hearing officer allegedly failed to address.

But this characterization of the hearings officer's findings and the Commissioner's consideration of those findings is misguided. A review of the superior court's ruling shows that it found: "The Hearing Officer has not made an explicit finding regarding 'net revenues,' However, as Northside correctly describes, BSSC will be charging higher prices for its services, and what logically flows from that statement is that it will be paid more for its services." The superior court further explained:

> The record reveals substantial evidence that supports the conclusion that the projected net revenues are reasonable, as discussed more below. Thus, the inference drawn by the Hearing Officer, combined with the evidence contained in the record, affords this [c]ourt the logical deduction that BSSC can achieve its projected net revenues. Therefore, the [c]ourt rejects this argument.

19

In making this deduction, the Commissioner did not find novel facts; she merely relied on facts already found by the hearing officer. This did not exceed the Commissioner's authority.

Our recent opinion in *Cartersville Med. Center v. Floyd Healthcare Mgmt.*, 365 Ga. App. 741 (880 SE2d 267) (2022), is instructive here. In that case, the Commissioner relied on facts found by the hearing officer as well as certain additional undisputed facts. We explained:

> It is true that the commissioner generally cannot modify or reject findings of fact that are supported by substantial competent evidence. See OCGA § 31-6-44 (k) (1). But the commissioner did not make credibility determinations or resolve evidentiary conflicts, which would have required a weighing of the evidence. Rather, he acknowledged the evidence supporting the hearing officer's factual recitation, while noting that other facts were important to understanding the specific circumstances in Bartow County. Nothing in OCGA § 31-6-44 (k) (1) precludes the commissioner from considering additional, undisputed facts that do not conflict with the hearing officer's factual findings.

Id. at 747. Here, the Commissioner also "acknowledged the evidence supporting the hearing officer's factual recitation." Id. The Commissioner then took facts decided by the hearing officer and subjected those facts to basic mathematics. The hearing officer determined that Northside-BSSC's projected number of patients was a reasonable estimate and that the higher prices it intended to charge for complex

20

procedures was also reasonable. These two numbers were considered by the Commissioner, and she simply analyzed facts found by the hearing officer using straightforward logic. For this reason, NGMC-BASC's argument fails. Id.

And, in addition, the hearing officer did include in its findings an indication that Northside-BSSC would be able to generate positive income by comparing its project to others with fewer doctors available to treat cases. While this finding does not use the term "net revenue," the finding of "positive income" directly supports the hearing officer's conclusion regarding Northside-BSSC's financial feasibility and, in turn, the Commissioner's affirmation of that conclusion. As such, NGMC-BASC's contention fails.

3. Finally, NGMC-BASC argues that there is no competent substantial evidence in the record that would support findings of fact necessary to reach the conclusion that Northside-BSSC's project would be financially feasible. See OCGA § 31-6-44.1 (a) (4), (5). Specifically, NGMC-BASC contends that Northside-BSSC's expert was unqualified and that, in the absence of her inadmissible testimony, there was no evidence of financial feasibility. "Ultimately, [a] reviewing court [must] determine[] whether 'any evidence' supports [the Department's] findings of fact and

21

whether the conclusions of law drawn from those factual findings are sound." *Drs. Hosp. of Augusta, LLC*, 356 Ga. App. at 430 (citations omitted).[8]

The CON Act defines "substantial evidence" as "relevant evidence [that] a reasonable mind might accept as adequate to support such findings, inferences, conclusions, or decisions, which such evidentiary standard shall be in excess of the 'any evidence' standard contained in other statutory provisions." OCGA § 31-6-44.1 (a) (5). With regard to evidence of financial feasibility, Chafin, Northside-BSSC's expert witness, provided testimony that Northside-BSSC would be providing complex procedures generating high revenue. In addition, the Department's review analyst testified that Northside-BSSC individually met the criteria for financial feasibility. He further testified that it was a logical assumption that Northside-BSSC would have higher charges based on the complexity of procedures performed. The analyst also concluded that, although Northside-BSSC's charges were more than double the average charge in its area, those charges were nonetheless reasonable. Additionally,

---

[8] We note that, to the extent NGMC-BASC argues that evidence of non-feasibility presented by NGMC-BASC's own expert is more accurate and more credible than evidence provided by Northside-BSSC, this argument fails. This court does not re-weigh evidence or consider credibility. See *North Fulton Community Hosp. v. State Health Planning & Dev. Agency*, 168 Ga. App. 801, 810 (4) (310 SE2d 764) (1983).

Dr. Stephen Fisher, a surgeon and expert in orthopedic and sports medicine, corroborated the fact that the 23-hour extended recovery unit at Northside-BSSC would allow more complex medical procedures to be performed. So, there was sufficient evidence in the record to support the finding that Northside-BSSC's project was financially feasible based on its provision of complex medical procedures at higher costs.

NGMC-BASC attempts to undercut this evidence on appeal by focusing, as it did below, on Chafin's testimony, contending that Chafin is only a health planning expert, not a healthcare finance expert, and she was merely relaying information from the person who prepared Northside-BASC's pro forma. But, in making these arguments, NGMC-BASC overlooks the rule that strict evidentiary standards for expert testimony do not apply in administrative hearings like those applicable to CON applications. OCGA § 24-7-702 (g) provides that evidentiary rules limiting expert opinion testimony are not strictly applied "in administrative proceedings conducted pursuant to [the Administrative Procedure Act]," and proceedings regarding CON application are conducted under the Administrative Procedure Act. OCGA § 31-6-44 (e). NGMC-BASC has not shown that Chafin's testimony regarding Northside-BSSC's financial feasibility was improper under this relaxed evidentiary standard.

And, in any event, as the superior court noted:

> The Hearing Officer's findings of fact regarding financial feasibility were not solely based upon Ms. Chafin's testimony. As Northside correctly points out, the Hearing Officer's findings regarding financial feasibility also rely on the testimony of the Department's Health Planners and BSSC's expert in Orthopedic and Sports Medicine Surgery.

Therefore, the record does contain "such relevant evidence as a reasonable mind might accept as adequate to support such findings, inferences, conclusions, or decisions" finding that Northside-BSSC's project would be financially feasible. OCGA § 31-6-44.1 (a) (5).

*Judgment affirmed. Miller, P. J., and Hodges, J., concur.*